# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CARLOS G. ROCHA and ARIZE 11, INC., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>FEDEX CORPORATION, a Delaware )<br>corporation, FED EX GROUND )<br>PACKAGE SYSTEM, INC., a Delaware )<br>Corporation, FEDEX HOME DELIVERY, )<br>a division of FedEx Ground Package )<br>System, Inc. doing business in Illinois, )<br>DANIEL J. SULLIVAN, ROGER G. )<br>MARTICKE, CLIFFORD P. JOHNSON, )<br>DAVID F. REBHOLZ, WILLIAM G. )<br>MARGARITIS, SCOTT RAY, NATHAN )<br>WATTS, RALPH STEPHENS, RJC 80 )<br>INC., and DOES 1-60, )<br>)<br>Defendants. ) | No. 12 C 8666<br><br>Chief Judge Rubén Castillo |

## MEMORANDUM OPINION AND ORDER

Carlos G. Rocha and Arize 11, Inc. (collectively, "Plaintiffs") bring this action alleging seventeen state and federal claims against various FedEx entities and employees: FedEx Corporation ("FedEx Corp."); FedEx Ground Package System, Inc. ("FedEx Ground" and, collectively with FedEx Corp., "FedEx"); FedEx Home Delivery ("FHD"); Daniel J. Sullivan, Rodger G. Marticke, Clifford P. Johnson, David F. Rebholz, William G. Margaritis, Scott Ray, Nathan Watts (these seven individuals collectively, "FHD Management"); Ralph Stephens; RJC 80, Inc.; and unknown other persons ("Does 1-60"). Presently before the Court are three motions to dismiss Plaintiffs' complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6)—one by Stephens; one by FedEx Corp. and

Margaritis; and one by FedEx Ground, FHD, and six members of FHD Management. For the reasons set forth below, these motions are granted.

## RELEVANT FACTS

Rocha delivered packages for FedEx's Chicago terminal, acting at various times as an employee and an independent contractor, "starting in late 2005 and ending in November 2010," when FedEx informed him that his services were no longer needed. (R. 37, Second Am. Compl. ¶ 58.) Arize 11 is an Illinois corporation that was formed in 2008 and that is owned by Rocha with its principal place of business in Chicago, Illinois. (*Id.* ¶¶ 60-61.)

FedEx Corp., a Delaware corporation with its principal place of business in Tennessee, is the parent corporation of FedEx Ground. (*Id.* ¶¶ 65-66.) FedEx Ground, a Delaware corporation with its principal place of business in Pennsylvania, is in the business of providing package delivery and pick-up service, often under the label of FHD. (*Id.* ¶¶ 73-74, 77-79.) Sullivan is FedEx Ground's former President and Chief Executive Officer, (*id.* ¶ 83), and Rebholz currently serves in that capacity, (*id.* ¶ 103). Marticke is FedEx Ground's Executive Vice President and Chief Operating Officer, (*id.* ¶ 90); Johnson is FedEx Ground's Vice President and General Counsel, (*id.* ¶ 95). Margaritis is the Senior Vice President of Global Communications and Investor Relations for FedEx Corp. in Tennessee. (*Id.* ¶¶ 110-11.) Ray worked in FedEx's Contractor Relations department in Pennsylvania. (*Id.* ¶¶ 117-18.) Watts managed FHD's Chicago terminal. (*Id.* ¶ 122.) Stephens manages numerous routes for FHD's terminals in Chicago and Hammond, Indiana, (*id.* ¶ 125); RJC 80 was an Illinois corporation Stephens owned until it was involuntarily dissolved last year, (*id.* ¶¶ 125, 128-29). Plaintiffs also bring claims against "all unknown persons and entities employed by or otherwise associated with" FedEx ("Does 1-50"), and all unknown persons and entities conspiring with or acting in concert with

Watts or Stephens in connection with the alleged conspiracy to extort and defraud Plaintiffs ("Does 51-60"). (*Id.* ¶¶ 131-36.)

Plaintiffs allege that in 1999 or 2000, agents of FHD "devised a deceptive business model whereby FedEx Ground would falsely represent itself . . . as an association of independent individuals and corporations while actually operating as a single corporation[.]" (*Id.* ¶ 139.) FedEx promised potential contractors the exclusive right to service all FHD customer accounts within their routes, returns on their investments, and the associated right to profits and income from those services rendered. (*Id.* ¶¶ 166-67.) Plaintiffs allege that FedEx did not intend to, and did not, entrust contracting individuals and corporations with the rights to offer, sell, or distribute its ground transportation services to the public. (*Id.* ¶¶ 140-41.) Plaintiffs allege that FedEx targeted unsophisticated individuals to be contractors, which allowed it to "retain full control" of operations and defraud its contractors. (*Id.* ¶¶ 140-44.)

Plaintiffs allege that FedEx "has a substantial or controlling interest in the market available to independent contractors seeking business opportunities in the ground transportation business," which limits the competing opportunities that are available to independent contractors. (*Id.* ¶¶ 53-55.) Plaintiffs state that FedEx maintains this controlling interest through "an ambiguous and misleading" Standard Operating Agreement (the "SOA"). (*Id.* ¶ 145.) According to Plaintiffs, the ambiguous provisions in the SOA "bolster the false belief that investing contractors would nonetheless be independent and free from FedEx's interference and control" while actually allowing FedEx to, *inter alia*, approve or disapprove independent contractors' vehicles, drivers or helpers, and vehicle sales, to assign pick-up and delivery stops to specific drivers, to require the purchase of specific insurance plans, to require drivers to perform service at certain times, and to delineate many other conditions of contractors' employment. (*Id.*

¶¶ 147-48.) Plaintiffs contend that Rocha and other independent contractors would not have executed the SOA if they had known about the misrepresentations it contained. (*Id.* ¶ 273.) Plaintiffs further allege that FedEx prevented contractors from using their vehicles for any purpose other than driving for FedEx. (*Id.* ¶¶ 335-36.)

Rocha began driving for FedEx in 2005 as a temporary employee. (*Id.* ¶¶ 211-12.) In order to acquire a route, FedEx required Rocha, like other independent contractors, to purchase a specific model truck. (*Id.* ¶¶ 213-16, 226.) Rocha was "misled by the [Chicago] terminal manager" to believe that he was purchasing a brand new truck from FedEx when he in fact purchased a used truck. (*Id.* ¶¶ 231-34.) The Chicago terminal manager offered Rocha a route in January 2006, and Rocha executed the SOA on February 23, 2006. (*Id.* ¶¶ 170-71, 242-44.) Rocha subsequently acquired a second route and a second truck. (*Id.* ¶¶ 237-40.)

Plaintiffs also allege that independent contractors were required to purchase various bundled products and services as part of the Business Support Package ("BSP"). (*Id.* ¶¶ 259-62.) The costs of the BSP were collected through involuntary deductions from their wages. (*Id.* ¶ 251.) Plaintiffs allege, for example, that FedEx made and refused to refund involuntary deductions from Rocha's wages for uniform rental fees even though Rocha had purchased all the uniforms necessary for his business. (*Id.* ¶ 261.) Plaintiffs allege that the products and services were not competitively priced and that FedEx profited from the contractors' purchases of the products and services. (*Id.* ¶¶ 252-55.) The SOA Plaintiffs attached to the complaint, however, states that contractors are not required to purchase the BSP and in fact requires contractors to affirmatively elect to purchase the BSP and have the costs deducted from their wages. (R. 37-3, SOA Ex. 6.) Rocha affirmatively elected to participate in the BSP when he executed his SOA. (*Id.*)

Plaintiffs allege that after a California State court ruled that FedEx's control over FHD drivers made them employees rather than independent contractors,[1] FedEx did not change its business practices, but instead conspired to protect the FHD business model and sustain the "fraudulent practices" of identifying drivers as independent contractors while maintaining employer-like control over their operations. (*Id.* ¶¶ 149-55.)

Plaintiffs allege that FedEx branches used various unlawful methods to maintain their control over the independent contractors. (*Id.* ¶ 298.) For example, sometime in 2006 after one of Rocha's drivers was in an accident, FedEx notified Rocha that it would cancel his contract in 30 days if he did not acquire his own trucking insurance. (*Id.* ¶ 300.) Rocha's terminal manager offered Rocha the opportunity to keep his route by transferring his routes and vehicles to another contractor for six months, to be returned to Rocha once he was in good standing. (*Id.* ¶ 301.) Rocha executed the transfer to the corporate contractor, Handzon Enterprise, and worked for Handzon Enterprise for six months. (*Id.* ¶¶ 302-03.) Plaintiffs allege that at the end of the six-month period, the owner of Handzon Enterprise told Rocha that FedEx had advised her that she did not need to return the routes and vehicles and did not need to continue to employ him. (*Id.* ¶¶ 303-04.) FedEx then barred Rocha from the terminal area where his trucks were parked. (*Id.* ¶ 305.) FedEx threatened to file a criminal complaint against Rocha if he attempted to access his trucks. (*Id.* ¶ 306.) Plaintiffs allege on information and belief that FedEx converted numerous trucks from other contractors in this manner and labelled the trucks and the routes "abandoned." (*Id.* ¶ 307.)

---

[1] Plaintiffs refer to *Estrada v. Fedex Ground Package Sys., Inc.*, No. BC210130 (Los Angeles Cnty. Super. Ct. 2004), but fail to attach the Superior Court's disposition. In *Estrada v. FedEx Ground Package System, Inc.*, 64 Cal. Rptr. 3d 327, 335-37 (Cal. Ct. App. 2007), however, the appellate court affirmed the lower court's holding that FedEx drivers were employees and not independent contractors.

The terminal manager told Rocha that he needed to pay Handzon Enterprise $4,300.00 to have his route and his trucks returned to him, which Rocha did in January 2007. (*Id.* ¶¶ 310-11.) His route and trucks were still not returned to him, and he was again barred from the terminal. (*Id.* ¶ 311.) Plaintiffs allege that a new terminal manager induced Rocha to forbear any right he had to sue and accept an alternative business arrangement until a new route became available. (*Id.* ¶ 313.) Pursuant to the alternative arrangement, Rocha worked as a "swing" contractor, covering for contractors who took vacation time, and Handzon Enterprises returned his trucks to him. (*Id.* ¶ 314-16.) Rocha held the swing position until he was terminated in November 2010. (*Id.* ¶¶ 317.) Plaintiffs allege that FedEx nevertheless continued to make unauthorized deductions from his wages as though he owned a route. (*Id.* ¶ 323.)

Plaintiffs allege that as a consequence of the initiation of a class action by some independent contractors, *Fluegel et al. v. FedEx Ground Package System, Inc.*, No. 1:05-cv-2326 (N.D. Ill. 2005), FedEx moved its Illinois operations to a new terminal facility with internal cameras to monitor contractor activities in the terminal. (*Id.* ¶ 326.) Plaintiffs allege that FedEx retaliated against its Illinois contractors for bringing suit in various other ways, including requiring contractors to pay the costs of various screenings associated with qualifying drivers, requiring contractors to pay the insurance-related risks the SOA specifically imposed on FedEx, refusing to provide contractors with trucking insurance in violation of the SOA, restraining contractors from using their trucking vehicles for other purposes and from recruiting and hiring drivers and helpers of their choosing, and restraining contractors from freely selling or transferring their routes. (*Id.* ¶¶ 327-47, 349.) These allegedly retaliatory changes were imposed by FedEx without the consent of the contractors and without their receipt of any additional consideration. (*Id.* ¶ 355.) These changes were implemented "through mandatory, retroactive,

and contractually prohibited addendums" that the contractors were forced to execute under threat of losing pay without having a chance to review. (*Id.* ¶¶ 357-59.)

Plaintiffs allege that Sullivan and other members of FHD Management conspired to revise the SOA for the purpose of concealing the continuation of practices the California court found to be unlawful and deceptive. (*Id.* ¶¶ 151, 155-58.) FedEx transitioned FedEx Ground from use of the SOA to what it called an "Independent Service Provider" business model ("ISP"). (*Id.* ¶ 160.) Plaintiffs allege that FedEx induced independent contractors to enter into ISP Agreements in place of their former SOAs through false promises of increased earning potential, but that FedEx continued "the same fraudulent and unfair practices" as before. (*Id.* ¶¶ 161-63, 188-97.) According to Plaintiffs, FedEx "routinely reconfigured [independent contractors' routes] without disclosure or payment" and, rather than paying damages for its breaches of the SOA Agreements, made "illusory promises of monetary incentives and increased earning potential" in order to induce their cooperation in the ISP transition. (*Id.* ¶¶ 190-92.)

To become an ISP candidate, contractors needed to have three or more routes, acquire additional vehicles and equipment, and have a corporate entity to serve as the official ISP candidate, by November 19, 2010. (*Id.* ¶ 369.) Rocha and other contractors were offered the opportunity to become ISP candidates, who would be able to sign an ISP Agreement to continue doing business with FedEx. (*Id.* ¶ 367.) Rocha accepted the ISP offer and acquired the requisites by November 19, 2010. (*Id.* ¶¶ 371-72.) To acquire the required number of routes, he entered into a contract with John Valez, an FHD driver, whereby Valez would transfer the routes he owned to Rocha but would continue to operate them, and Rocha would pay Valez all profits and proceeds from the operation of those routes. (*Id.* ¶¶ 373-77.) Plaintiffs allege that Arize 11 was an express third-party beneficiary of the contract. (*Id.* ¶ 378.) FedEx informed Rocha that

Valez was not a contractor and had no authority to transfer his routes, but that FedEx would transfer the routes directly to Rocha. (*Id.* ¶ 379.) Rocha then received confirmation from his senior manager that he had complied with the ISP candidate requirements and that he would have an opportunity to negotiate an ISP Agreement if he completed certain steps detailed in the ISP transition guide. (*Id.* ¶¶ 380-83, 395.)

As a condition to signing an ISP Agreement, Rocha was asked to execute a supplemental release of all claims related to the termination of his SOA and the sale or transfer of his routes and vehicles. (*Id.* ¶¶ 418-23.) Rocha refused to sign the release. (*Id.* ¶¶ 425-27.) Although Rocha was still allowed to join the ISP, Watts subsequently called Rocha a "troublemaker" upon meeting him, (*id.* ¶¶ 626), and FedEx "initiated a baseless and slanderous investigation against Rocha" for alleged sexual harassment, (*id.* ¶¶ 437). A FedEx manager told Rocha that FedEx would cease processing his sales during the investigation, although the investigation was quickly terminated in Rocha's favor. (*Id.* ¶¶ 438-45.) Plaintiffs also allege that FedEx subjected Rocha to a string of false accusations and unfounded termination reviews following his acceptance of the ISP offer. (*Id.* ¶¶ 446-48.)

Plaintiffs allege that rather than terminating undesired FHD contractors, FedEx instead made false allegations of misconduct against the contractors and used threats of physical violence or arrest to prevent them from entering or exiting the terminal to service their routes. (*Id.* ¶ 175.) Plaintiffs allege that FedEx used "threats of economic harm, intimidation, and sheer force" to coerce the "cooperation and continued investment" of contractors, and that contractors who did not cooperate with FHD Management's demands faced a "likely taking of their proprietary interests." (*Id.* ¶¶ 176-80.) Rocha and other contractors were "threatened with termination and/or non-renewal of their operating agreements, forfeiture of their investments

and/or other economic loss" if they refused to execute FedEx's waivers, purchase FedEx products and services, accept deductions from their pay, and adopt and enforce FedEx rules contrary to those listed in the SOA. (*Id.* ¶ 181.)

Rocha and other contractors were ultimately "forced to sell all rights and interests" they held in their routes and vehicles to avoid having such proprietary interests "simply taken." (*Id.* ¶ 404.) Plaintiffs allege that FedEx security personnel physically attacked an individual who Arize 11 had subcontracted as a driver in March 2011. (*Id.* ¶ 186.) Plaintiffs contend that this attack and fear of others like it caused Rocha to "concede to extortionate demands from FedEx that he transfer routes and vehicles used in his business to Stephens," (*id.* ¶ 187.) Plaintiffs allege, however, that in February 2011, before the alleged physical attack, Watts, Stephens, Valez, and Does 51-60 fraudulently induced Rocha to assign his SOA to Arize 11 at a much lower price than its true value and then transferred Arize 11's assets assigned to RJC 80. (*Id.* ¶¶ 451, 483.) Watts terminated Rocha as a qualified FedEx driver on February 18, 2011. (*Id.* ¶ 460.)

## PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on October 30, 2012. (R. 1, Compl.) Plaintiffs amended their complaint twice—once on November 9, 2012, (R. 5, Am. Compl.), and again on February 13, 2013, (R. 37, Second Am. Compl.). Plaintiffs allege racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (Counts I-V); unlawful trade restraints and tying arrangements in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and the Clayton Antitrust Act, 15 U.S.C. § 14, (Counts VI and VII); retaliatory discharge in violation of the National Labor Relations Act (the "Labor Act"), 29 U.S.C. § 157

(Count XVII); and several claims under Illinois State statutes and common law.[2]  On March 28,

2013, Defendants filed three motions to dismiss the complaint for failure to state a claim upon

which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  Stephens filed

his own motion, (R. 57, Stephens' Mot.); FedEx Ground, FHD, Johnson, Marticke, Ray,

Rebholz, Sullivan, and Watts filed a separate motion, (R. 60, Defs.' Mot.), which Stephens

joined, (R. 57, Stephens' Mot. ¶ 5); and FedEx Corp. and Margaritis filed a third motion, (R. 62,

Margaritis' Mot.), and also joined the joint motion (R. 60),[3] (R. 63, Margaritis' Mem. at 2).  On

June 4, 2013, Plaintiffs responded to FedEx's motions.  (R. 68, Pls.' Resp.)  Defendants filed a

joint reply in support of their motions to dismiss on July 1, 2013.  (R. 70, Defs.' Reply.)

## LEGAL STANDARDS

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a

claim upon which relief may be granted."  *Hallinan v. Fraternal Order of Police of Chi. Lodge*

*No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  When reviewing a Rule 12(b)(6) motion to dismiss,

the Court construes the complaint in the light most favorable to the nonmoving party, accepts all

well-pleaded factual allegations as true, and draws all reasonable inferences in the non-movant's

favor.  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).  Pursuant to Rule 8(a)(2), a

---

[2]  Plaintiffs' State law claims include violations of the Business Opportunity Sales Law of 1995,
815 Ill. Comp. Stat. 602/5-1 *et seq.* (Count VIII); the Wage Payment and Collection Act, 820 Ill.
Comp. Stat. 115/1 *et seq.* (Count IX); the Whistleblower Act, 740 Ill. Comp. Stat. 174/1 *et seq.*
(Count X); and the Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat.
505/1 *et seq.* (Count XI).  Plaintiffs' common law claims include: breach of the SOA (Count XII)
and the ISP Transition Agreement (Count XV); fraudulent inducement (Count XIII); promissory
estoppel (Count XIV); and unjust enrichment (Count XVI).

[3]  The Court finds sufficient grounds to dismiss the complaint in the joint motion, (R. 60, Defs.'
Mot.), which all moving defendants have joined.  Accordingly, the Court does not address the
unique arguments for dismissal that pertain to individual defendants, (R. 57, Stephens' Mot.; R.
58, Stephens' Mot. & Mem.; R. 62, Margaritis' Mot.; R. 63, Margaritis' Mem.), but grants the
motions to dismiss based on arguments within the joint motion.

complaint must contain "a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Id.* (quoting Fed. R. Civ. P. 8(a)(2) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A document that is attached to a pleading "is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, when ruling on a Rule 12(b)(6) motion to dismiss, a court must "consider documents attached to the complaint as part of the complaint itself." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citing *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 729 (7th Cir. 1999)). "Such documents may permit the court to determine that the plaintiff is not entitled to judgment" in his favor. *Id.* (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009)).

## ANALYSIS

As an initial note, the Court finds the complaint to be "an egregious violation of Rule 8(a)." *Hartz v. Friedman*, 919 F.2d 469, 471 (7th Cir. 1990) (finding that the district court "might well have dismissed" a 125-page, 323-paragraph complaint on Rule 8(a) grounds); *see also Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775-76 (7th Cir. 1994) (finding that a 119-page, 385-paragraph complaint was "confusing, redundant, and seemingly interminable" and that it "violated the letter and the spirit of Rule 8(a)"). Plaintiffs' second amended complaint consists of 127 pages (exclusive of exhibits), 745 paragraphs, and seventeen counts. The sheer volume and repetitiveness of Plaintiffs' complaint raises Rule 8 concerns, as does the fact that many of Plaintiffs' "facts" are actually legal conclusions. This Court has better things to do than "to fish a gold coin from a bucket of mud," and the Court would be justified dismissing this complaint based solely upon its violation of Rule 8(a). *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003). For the sake of completeness,

however, the Court addresses the merits of the motion to dismiss and finds that, despite the prolixity of the complaint, Plaintiffs have failed to state a claim upon which relief may be granted.

In Counts I-V, Plaintiffs allege violations of all four RICO subsections. In Count I, Plaintiffs allege that all Defendants violated section 1962(a), (R. 37, Second Am. Compl. ¶¶ 485-508); in Count II, Plaintiffs allege that all Defendants violated section 1962(b), (*id.* ¶¶ 509-19); in Count III, Plaintiffs allege that FedEx and FHD Management violated section 1962(c), (*id.* ¶¶ 520-30); in Count IV, Plaintiffs allege that all Defendants violated section 1962(d), (*id.* ¶¶ 531-37); and in Count V, Plaintiffs allege a separate violation of section 1962(d) by FedEx, FHD Management, Stephens, and Does 51-60, (*id.* ¶¶ 538-44). Defendants argue that Plaintiffs fail to state a RICO claim because they do not sufficiently allege the existence of an enterprise or a pattern of racketeering. (R. 61, Defs.' Mem. at 8-13.) Although there are significant substantive differences among the four cited RICO provisions, the existence of an "enterprise" and a "pattern of racketeering" are elements that are fundamental to each of the RICO subsections. 18 U.S.C. §§ 1962(a)-(d); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1303-04 (7th Cir. 1987). As a result, the Court will first examine the complaint to determine whether Plaintiffs have properly alleged the existence of an enterprise and a pattern of racketeering before turning to the additional requirements specific to each subsection of the RICO statute.

## I.      Whether Plaintiffs have sufficiently pleaded the existence of an enterprise

Defendants first argue that Plaintiffs have failed to identify a RICO enterprise. (R. 61, Defs.' Mem. at 8-9.) The "first rule" of pleading a RICO claim is that the "plaintiff must identify the enterprise." *Jennings v. Emry*, 910 F.2d 1434, 1439-40 (7th Cir. 1990) (quotation omitted). Under the RICO statute, an "enterprise" can include "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). While this definition is broad, a RICO enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Plaintiffs refer to FHD as "the FHD Enterprise" throughout the complaint, and Plaintiffs allege that FedEx and the FHD Management conducted their racketeering and extortion activities through the FHD Enterprise. (*See, e.g.*, R. 37, Second Am. Compl. ¶¶ 179, 208.) In their response, Plaintiffs clarify that "[e]ach of the FedEx Defendants, conspiring together, are alleged to have had sufficient position, title, and authority to control the affairs of the FHD Enterprise[.]" (R. 68, Pls.' Resp. at 3.)

In *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226-28 (7th Cir. 1997), the plaintiff brought a RICO claim against Chrysler Corporation alleging warranty fraud. The RICO enterprise was alleged to be "a 'Chrysler family' consisting of subsidiaries of the Chrysler corporation engaged in various facets of production, financing, and marketing of Chrysler automobiles to the investing public." *Id.* at 226. In determining whether the plaintiff adequately alleged the existence of a RICO enterprise, the Seventh Circuit considered the type of conduct meant to be targeted by the RICO statute. *Id.* In the court's view, the "prototypical" RICO case is "one in which a person bent on criminal activity seizes control of a previously legitimate firm" and uses the firm's resources to perpetrate more extensive, and less discernable, criminal acts than he could do on his own. *Id.* at 227. "What we cannot imagine, and what we do not find any support for in appellate case law, is applying RICO to a free-standing corporation such as Chrysler merely because Chrysler does business through agents, as virtually every manufacturer does." *Id.* The court found that Chrysler's corporate structure did not make a difference "from

13

the standpoint of preventing the type of abuse for which RICO was designed." *Id.* ("If Chrysler were even larger than it is and as a result had no agents, but only employees (it might own all its dealerships), it could not be made liable for warranty fraud under RICO."). The Seventh Circuit held that RICO is not triggered in an ordinary case of conspiracy between a corporation and its subsidiaries or employees, and that Chrysler and the members of its "corporate family" did not constitute a RICO enterprise. *Id.*

Here, as in *Fitzgerald*, Defendants are all members of the same "corporate family"—each Defendant is either a subsidiary or affiliated corporation or an individual who is named based on his activities as an agent of FedEx. As members of the FedEx corporate family, Defendants do not constitute a RICO enterprise in the scenario alleged by Plaintiff. *Fitzgerald*, 116 F.3d at 227; *see also Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 n.3 (7th Cir. 2000) (plaintiff cannot establish a RICO enterprise by naming corporation's franchises in addition to the corporation); *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998) (plaintiff cannot establish enterprise "merely by showing that the pattern of predicate acts . . . were committed by a firm that has agents or affiliates . . . The firm must be shown to use its agents or affiliates in a way that bears at least a family resemblance to the paradigmatic RICO case in which a criminal obtains control of a legitimate (or legitimate-appearing) firm and uses the firm as the instrument of his criminality."). The substance of Plaintiffs' claims involve fraud and breach of contract, and Plaintiffs have failed to allege facts that plausibly suggest that Defendants seized control of FHD and used it to perpetrate large-scale criminal activity. Instead, Plaintiffs are "trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992).

Plaintiffs additionally fail to attribute a common purpose to the alleged FHD Enterprise.

*See Boyle*, 556 U.S. at 946; *see also Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) (common purpose is "essential ingredient" of any association-in-fact enterprise). A purpose aside from the predicate acts themselves is an essential element of a RICO enterprise. *Stachon*, 229 F.3d at 675. The absence of factual allegations regarding the operations and purpose of the alleged enterprise is fatal to the claim. *See Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 400 (7th Cir. 2009) (affirming dismissal of complaint that failed to "indicate how the different actors are associated" and did "not suggest a group of persons acting together for a common purpose").

Confusingly, Plaintiffs also allege an enterprise consisting of "the combined business operations of both the FedEx employees responsible for directing and managing the FHD Enterprise and the network of investing home delivery contractors providing services rendered by the FHD Enterprise." (R. 37, Second Am. Compl. ¶ 80.) Although Plaintiffs allege that "[t]he FHD Enterprise, or the collective businesses of FHD contractors associated by the SOA, constitutes an 'enterprise' separate and distinct from FedEx itself," (*Id.* ¶ 521), and that "FHD's Chicago terminal, as an entity separate and distinct from FedEx and other FHD terminals, is an enterprise engaged in interstate and foreign commerce," (*id.* ¶ 523), these allegations of enterprises fail because "[a] firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself." *Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 932 (7th Cir. 1999). Plaintiffs fail to allege any specific details about any separate enterprises, and allude only vaguely in their response to "various enterprises beyond the FHD Enterprise," (R. 68, Pls.' Resp. at 2). Even drawing all inferences in Plaintiffs' favor, the Court cannot find a plausible suggestion of a RICO enterprise within the complaint.

An enterprise is an essential element of a claim under RICO. 18 U.S.C. § 1962. Because Plaintiffs have failed to allege a RICO enterprise, their RICO claims cannot survive Defendants'

motions to dismiss. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009); *Stachon*, 229 F.3d at 677; *Fitzgerald*, 116 F.3d at 228. Accordingly, the Court dismisses Counts I-V for failure to state a claim.

## II. Whether Plaintiffs have sufficiently stated an antitrust claim in Counts VI and VII

Defendants contend that Plaintiffs have failed to state a claim for relief under the Sherman Act or the Clayton Act. (R. 61, Defs.' Mem. at 14.) In Count VI, Plaintiffs allege that FedEx, FHD, and Does 1-50 unlawfully restrained trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. (R. 37, Second Am. Compl. ¶¶ 546, 548.) Plaintiffs also allege that FedEx and FHD Management unlawfully tied certain products and services in violation of Section 1 of the Sherman Act (Count VI), (*id.* ¶¶ 549, 551-56), and in violation of Section 3 of the Clayton Act (Count VII), (*id.* ¶¶ 574-76). Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that restrain interstate trade or commerce. 15 U.S.C. § 1. Section 3 of the Clayton Act prohibits, as relevant here, the tying of sales of products, if the tying substantially lessens competition. 15 U.S.C. § 14. Defendants argue that Plaintiffs have failed to state a claim under either act.

### A. Whether Plaintiffs sufficiently plead a conspiracy to restrain trade in violation of the Sherman Act

Defendants argue that this Court should dismiss Count VI because Plaintiff does not plausibly allege the existence of a conspiracy. (R. 61, Defs.' Mem. at 15.) Specifically, Defendants argue that a single firm's officers and employees cannot conspire with themselves for the purposes of a Sherman Act conspiracy, and that Plaintiffs failed to allege co-conspirators with any specificity. (*Id.*) A prevailing claim under Section 1 of the Sherman Act "requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc.*

*v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993).  Plaintiffs allege that FedEx and FHD Management conspired "with each other and a select group of larger prospering contractors within the FHD Enterprise to restrain trade and commerce with respect to services rendered by other smaller FHD contractors."  (R. 37, Second Am. Compl. ¶ 546.)  Plaintiffs further allege that FedEx and FHD Management conspired with "multiple manufacturers, vendors, service providers, and other third parties dealing in products and services forced upon FHD contractors, to restrain trade and commerce in products and services sold or rendered to FHD contractors."  (*Id.* ¶ 548.)

To plead the existence of a combination or conspiracy under the Sherman Act, Plaintiffs must allege facts that, if true, demonstrate that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  The Court was unable to locate any such facts within the complaint, and Plaintiffs do not identify any in response to Defendants' motion.  Plaintiffs' allegations of conspiracy involving FedEx, FHD, and FHD Management fail to state an antitrust conspiracy because "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy."  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984).  And, although the Court views the facts alleged in Plaintiffs' favor, the complaint does not provide "enough factual matter" to suggest that an agreement was made between FedEx, an amorphous group of unnamed dominant contractors, and numerous other unspecified manufacturers, vendors, suppliers, and service providers.  *See Twombly*, 550 U.S. at 556. Plaintiffs' "bare assertion of conspiracy" accompanied by a "conclusory allegation of agreement at some unidentified point" is inadequate to allege the existence of a combination or conspiracy.

*See id.* at 556-57. Thus, Plaintiffs fail to plausibly plead one of the necessary elements of their Sherman Antitrust Act claim.

Seeking to avoid this result, Plaintiffs argue that they establish a Sherman Act conspiracy or agreement by showing a tying agreement. (R. 68, Pls.' Resp. at 8.) Section 1 of the Sherman Act prohibits wrongful tying of products and services, and Section 3 of the Clayton Act prohibits wrongful tying of products. *See Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 592 (7th Cir. 2008). The standards for tying claims under both acts are identical, *id.*, and the Court will address both claims together.

### B.     Whether Plaintiffs sufficiently plead unlawful tying in violation of the Sherman Act and the Clayton Act

Plaintiffs allege that FedEx, FHD, FHD Management, and Does 1-50 unlawfully tied certain products and services in violation of Section 1 of the Sherman Act (Count VI), (*id.* ¶¶ 549, 551-56), and in violation of Section 3 of the Clayton Act (Count VII), (*id.* ¶ 574-76). A tying agreement is an "agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product[.]" *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). Though tying agreements were once thought to be a *per se* violation of the antitrust laws, the law now provides that "[m]any tying arrangements . . . are fully consistent with a free, competitive market." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45 (2006). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) *abrogated on other grounds by Ill. Tool Works*, 547 U.S. 28 (2006). Such "forcing" is indicative of an antitrust violation. *Id.* To state a claim of unlawful tying, Plaintiffs must allege four elements: (1) the existence of a

18

tying arrangement between two distinct products or services; (2) that Defendants have sufficient economic power in the tying market to appreciably restrain free competition for the tied product or service; (3) that the tie "affects a not-insubstantial amount of interstate commerce" of the tied product or service; and (4) that Defendants have some economic interest in the sales of the tied product or service. *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006).

Plaintiffs allege that FedEx, its management, and the same unspecified third parties alleged in Count VI of the amended complaint "entered into unlawful contracts, agreements and understandings" to tie products and services in a way which "substantially limited competition and tended to create a monopoly." (R. 37, Second Am. Compl. ¶¶ 574-75.) Specifically, Plaintiffs allege that FedEx and FHD Management tied the purchase of specific vehicles and various services and products in the BSP to the acquisition of a route, the execution of a SOA, and the renewal of the SOA. (*Id.* ¶¶ 549, 551-52.) These products and services include scanners, vehicle washing services, locks, uniforms, driver screenings, vehicle inspections, and auditing and mapping software services. (*Id.* ¶ 552.) Plaintiffs allege that they were forced to purchase these products and services, which "served no legitimate business purpose," (*id.* ¶ 554), and which were more expensive than other reasonable alternatives, (*id.* ¶¶ 563-66). Plaintiffs allege that they and other contractors would not have purchased these products and services if they were not unlawfully tied to the contractors' SOAs and routes. (*Id.* ¶ 553.)

In short, Plaintiffs have alleged that they were forced to purchase vehicles and the BSP (the tied products and services) in order to acquire and maintain an SOA (the tying product). The vehicles and the BSP are clearly distinct from the SOA; however, the Court is not convinced that the SOA is a tying product. Although the Seventh Circuit has not addressed this issue, the Second Circuit has held that employment as an independent contractor is not a tying product. *De*

*Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 71 (2d Cir. 1996); *see also Castegneto v. Corporate Exp., Inc.*, 13 F. Supp. 2d 114, 117 (D. Mass. 1998) (finding that an independent contractor in the package delivery service failed to state a tying claim because an employment contract is not a tying product). The Second Circuit stated that the "tying claim fails at the threshold," reasoning that "[i]t is simply implausible to regard Plaintiffs' employment, a service which they provide to [Defendant] and for which they are paid by [Defendant], as something that [Defendants are] selling to Plaintiffs." *De Jesus*, 87 F.3d at 71. This Court finds the Second Circuit's reasoning sound and concludes that the SOA—an agreement by which independent contractors sell their services to FedEx—is not a tying product. Plaintiffs have thus failed to plead the first element of a tying claim. *See Reifert*, 450 F.3d at 317.

Even if the SOA was a tying product, Plaintiffs have failed to adequately allege that Defendants have sufficient market power in the tying market to appreciably restrain competition in the markets for the tied products and services. *See id.* Plaintiffs allege that purchasing one of a few specific models of truck was a precondition to being hired by FedEx as an independent contractor. (R. 37, Second Am. Compl. ¶ 213.) Plaintiffs also allege that FedEx forced FHD contractors to purchase the BSP and deducted the cost of the BSP from Rocha's wages without Rocha's prior voluntary consent. (*Id.* ¶ 249.) This allegation is belied by Addendum 6 to the SOA, which lists the products and services that are included in the BSP and states: "Contractor is not required to purchase the Business Support Package. The cost of the Package is $4.25 per day, per van, for each business day Contractor is entitled to receive van availability." (R. 37-3, SOA Ex. 6.) At the bottom of Addendum 6, Rocha affirmatively elected to participate in the Business Support Package. (*Id.*)

"A tying claim generally requires that the defendant's economic power be derived from the market, not from a contractual relationship that the plaintiff has entered into voluntarily." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 973 (9th Cir. 2008) (collecting cases). Plaintiffs purchased specific vehicles and the BSP because they contractually agreed to do so, (R. 37, Second Am. Compl. ¶¶ 270-72), not because of FedEx's "overwhelming market power." *See Siemer v. Quizno's Franchise Co. LLC*, No. 07 C 2170, 2008 WL 904874, at * 11 (N.D. Ill. Mar. 31, 2008) (holding that franchisees' allegations that they were forced to purchase certain equipment in order to obtain a franchise did not state a tying claim); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d Cir. 1997) ("plaintiffs' acceptance of a franchise package that included purchase requirements and contractual restrictions is consistent with the existence of a competitive market . . . Plaintiffs need not have become Domino's franchisees."). Plaintiffs allege that although Rocha initially agreed, he was not given an opportunity to discontinue his participation in the BSP, in direct violation of the SOA. (*Id.* ¶¶ 258-59.) This allegation may state a claim for breach of contract, but it does not establish that FedEx used its market power to force Plaintiffs to pay for unwanted products and services, a necessary element of a tying claim.

Accordingly, the Court dismisses the antitrust claims in Counts VI and VII of the complaint for failure to state a claim upon which relief may be granted.

### III. Whether Plaintiffs have sufficiently stated a claim in Count XVII for retaliatory discharge

Defendants argue that the Labor Act deprives the Court of subject matter jurisdiction over Plaintiffs' retaliatory discharge claim. (R. 61, Defs.' Mem. at 33-34.) Section 7 of the Labor Act protects employees' rights to organize for the purpose of collective bargaining or other mutual protection. 29 U.S.C. § 157. Plaintiffs allege that FedEx Ground and FHD

retaliated against and ultimately discharged Rocha for "concerted activity" that was protected under Section 7 of the Labor Act. (R. 37, Second Am. Compl. ¶¶ 739-40.) Plaintiffs seek relief pursuant to the Illinois Whistleblower Act, the Illinois Wage Payment and Collection Act, and the Labor Act. (*Id.* ¶ 734.)

The Labor Act is one of those "exceptional" federal statutes that receives "such wide berths as to displace virtually all state laws in the neighborhood." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 577 (7th Cir. 2012). "Much conduct that is arguably forbidden as an unfair labor practice by the National Labor Relations Act, or arguably protected by that statute, is covered by the complete-preemption doctrine." *Hughes v. United Air Lines, Inc.*, 634 F.3d 391, 395 (7th Cir. 2011). Federal courts "do not entertain suits about unfair labor practices; only the National Labor Relations Board can adjudicate disputes under sections 7 or 8 of the NLRA." *Id.*; *see also San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 245 (1959) ("When an activity is arguably subject to s 7 or s 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."). Rather, dismissal of the claim for lack of jurisdiction is appropriate. *Carr v. Metals*, 351 F. App'x 128, 129 (7th Cir. 2009) ("To the extent that Carr can show he was disciplined in retaliation for participating in union activities, the district court was correct to find that it lacked jurisdiction over that claim. The National Labor Relations Board has primary jurisdiction over suits based on practices regulated by the National Labor Relations Act.").

Seeking to avoid this result, Plaintiffs argue that they "engaged in no union activities" and that the concerted activity alleged "involved the support of a class action lawsuit brought by FHD contractors[.]" (R. 68, Pls.' Resp. at 14.) Plaintiffs argue that their claims are of peripheral

concern to federal labor law and thus are excepted from preemption. (*Id.* at 14-15.) The protections of the Labor Act are not limited to unions, however, and the involvement in a class action law suit "designed to . . . protect FHD contractors," (R. 37, Second Am. Compl. ¶ 738), falls squarely within the Labor Act. 29 U.S.C. § 157 ("Employees shall have the right to . . . engage in other concerted activities for the purpose of . . . mutual aid or protection"). In fact, Plaintiffs invoke the protections of the Labor Act within Count XVII. (R. 37, Second Am. Compl. ¶ 739.)

The preemption doctrine set out in *Garmon* "not only mandates the substantive preemption by the federal labor law in the areas to which it applies, but also protects the exclusive jurisdiction of the NLRB over matters arguably within the reach of the Act." *Local 926, Int'l Union of Operating Engineers, AFL-CIO v. Jones*, 460 U.S. 669, 680 (1983). Plaintiffs allege that Rocha was discharged for engaging in protected concerted activity. Pursuant to the Labor Act, Plaintiffs must file a complaint with the NLRB for the resolution of their retaliatory discharge claim, and Count XVII is dismissed.

## VIII. Plaintiffs' remaining claims under state law

Plaintiffs have also asserted claims under the Illinois Business Opportunity Sales Law of 1995, 815 Ill. Comp. Stat. 602/5 *et seq.* (Count VIII); the Illinois Wage Payment and Collection Act, 820 Ill Comp. Stat. 115/1 *et seq.* (Count IX); the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/1 *et seq.* (Count X); and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill Comp. Stat. 505/1 *et seq.* (Count XI); as well as claims of breach contract (Counts XII and XV); fraudulent inducement (Count XIII); promissory estoppel (Count XIV); and unjust enrichment (Count XVI). Plaintiffs' RICO, Sherman Act, and Clayton Act claims were the basis of the Court's subject matter jurisdiction, and their state law claims are before the Court only

under federal supplemental jurisdiction.[4]  28 U.S.C. § 1367(a).  Where all federal claims are dismissed before trial, the "usual practice" is that a federal district court should generally dismiss the supplemental claims.  *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).  There is no compelling reason for this Court to retain jurisdiction.  As a result, the Court dismisses Counts VIII through XVI without prejudice to their refiling in state court.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss (R. 57, Stephens' Mot.; R. 58, Stephens' Mot. & Mem.; R. 60, Defs.' Mot.; R. 62, Margaritis' Mot.; R. 63, Margaritis' Mem.).  Plaintiffs are granted leave to file an amended federal complaint in this case if they can address the fundamental deficiencies set forth in this opinion in no more than 300 clear paragraphs that are not repetitive, speculative, or conclusory.  In the alternative, plaintiffs remain free to proceed in state court instead of trying to establish federal jurisdiction for this dispute where none may exist.

ENTERED:

Chief Judge Rubén Castillo
United States District Court

Dated: January 17, 2014

---

[4]  Plaintiffs only allege that this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  (R. 37, Second Am. Compl. ¶ 15.)  Arize 11 is an Illinois corporation, (*id.* ¶ 60); thus diversity jurisdiction pursuant to 28 U.S.C. § 1332 is precluded.